Filed 2/18/22

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| In re J.B., a Person Coming Under the Juvenile Court Law. | H049130 (Santa Cruz County Super. Ct. No. J22783C) |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>J.B.,<br><br>        Defendant and Appellant. | |


## I.        INTRODUCTION

Minor J.B. challenges the juvenile court's order committing him to the California Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ)[1] on the most recently sustained juvenile wardship petition, where minor admitted committing second degree murder (Pen. Code, § 187, subd. (a)), an offense enumerated under Welfare and Institutions Code section 707, subdivision (b) (707(b)).[2]  In order to commit minor to DJJ without violating section 733, subdivision (c) (section 733(c)), which

---

[1] The DJJ is also known as the California Department of Corrections and Rehabilitation, Division of Juvenile Facilities (DJF).  (*In re N.C.* (2019) 39 Cal.App.5th 81, 85, fn. 3.)  DJJ and DJF are used interchangeably in case law.  (*Ibid.*)

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

prohibits a DJJ commitment if "the most recent offense alleged in any petition and admitted or found to be true by the court is not described in subdivision (b) of Section 707 or subdivision (c) of Section 290.008 of the Penal Code," the juvenile court dismissed two adjudicated petitions involving more recent non-707(b) offenses. The court ordered the dismissals pursuant to section 782, which allows a juvenile court to dismiss a petition "if the court finds that the interests of justice and the welfare of the person who is the subject of the petition require that dismissal, or if it finds that he or she is not in need of treatment or rehabilitation."

Minor contends that the juvenile court lacked authority under section 782 to dismiss the adjudicated petitions for the sole purpose of committing him to DJJ because the DJJ commitment was barred by section 733(c). The Attorney General contends that the court acted within its broad discretion under section 782.

Based on our de novo review of sections 733(c) and 782, the California Supreme Court's guidance and reasoning in *In re Greg F.* (2012) 55 Cal.4th 393 (*Greg F.*), and the circumstances before us, we conclude that section 733(c) did not bar the juvenile court from exercising its discretion under section 782 and dismissing the adjudicated petitions in the interests of justice and in minor's welfare in order to commit minor to DJJ. Accordingly, we will affirm the judgment.[3]

---

[3] We note that in 2020 the Legislature passed "juvenile justice realignment" through Senate Bill No. 823 (2019-2020 Reg. Sess.). (Stats. 2020, ch. 337.) "Effective July 1, 2021, newly enacted section 736.5 shifts responsibility for convicted youth offenders from DJJ to the county level. (§ 736.5, subd. (a).) All wards committed to DJJ prior to July 1, 2021 will remain in DJJ custody. (*Id.*, subd. (d).) But pending final closure of DJJ in June 2023, a court may only make a DJJ commitment if the minor 'is otherwise eligible to be committed under existing law and in whose case a motion to transfer the minor from juvenile court to a court of criminal jurisdiction was filed.' (*Id.*, subds. (b), (c), (e); see also § 733.1, subds. (a)-(b).)" (*In re Miguel C.* (2021) 69 Cal.App.5th 899.)

## II. BACKGROUND

### A. *Factual Background*

The parties stipulated that the factual basis for minor's plea were the facts adduced at the transfer hearing and the preliminary hearing. Neither hearing is part of the record on appeal. At the jurisdictional hearing, the prosecution summarized the facts as follows: "[O]n or about August 8th, 2012 [minor] and a number of other minors drove to the City of Santa Cruz from the City of Watsonville and sought and located the juvenile victim Joey M. [Minor] then shot and killed Joey M. in the County and City of Santa Cruz." The prosecution stated that the offense occurred "in the context of gang activity." Minor's counsel added, "[T]he group of which [minor] was a part was not specifically looking for victim Joey M. but happened upon him."

### B. *Procedural History*

#### 1. Prior 602 Petitions[4]

On August 20, 2012, in case No. J22783, minor admitted the allegation that on July 16, 2012, he committed misdemeanor resisting, delaying, or obstructing a peace officer (Pen. Code, § 148, subd. (a)(1)). An additional misdemeanor allegation against minor was dismissed. Minor was granted six months of probation without wardship.

On November 6, 2012, in case No. J22783A, minor admitted the allegation that on October 11, 2012, he possessed a concealable pistol, revolver, or other firearm as a juvenile (Pen. Code, § 29610). An additional felony allegation and a misdemeanor allegation were dismissed. Minor was declared a ward of the court and placed on probation with more intensive supervision. The wardship terminated in October 2018 when minor turned 21 years old.

On January 4, 2013, in case No. J22783B, minor admitted the allegation that on December 15, 2012, he possessed a concealable pistol, revolver, or other firearm as a

---

[4] The prior petitions are not part of the record on appeal. We rely on the probation officer's report for this summary.

3

juvenile and admitted that he violated the terms of his probation. An additional misdemeanor allegation was dismissed. The juvenile court continued minor as a ward of the court, order him into 24-hour placement, and subsequently placed him at Tyler House in Watsonville. Minor was terminated unsuccessfully from the program in April 2013, which constituted a probation violation. The court ordered minor to remain a ward of the court, ordered him into 24-hour placement, and later placed him at Tahoe Turning Point Program. The wardship terminated in October 2018 when minor turned 21 years old.

### 2. Current 602 Petition & Admission

In October 2013, minor was arrested for a homicide that occurred on August 8, 2012, when minor was 14 years old. According to the prosecution, "[t]he thorough investigation of the homicide and the discovery of all participants resulted in a delay between the date of the homicide and the filing of charges of almost 14 months." The probation report details law enforcement's investigation of the homicide from August 8, 2012 through September 19, 2013.

The prosecution filed a complaint in adult court against minor on October 15, 2013.[5] Minor was transferred to the county jail on October 27, 2015, after he turned 18. On December 16, 2016, after the passage of Proposition 57, which eliminated the ability of prosecutors to charge minors directly in adult court, the prosecution filed a petition in juvenile court alleging minor committed murder.[6] A transfer hearing was conducted, and the juvenile court determined that minor should be transferred to adult court.

In March 2021, after extensive litigation, minor was transferred back to juvenile court based on the passage of Senate Bill No. 1391 (2017-2018 Reg. Sess.), which amended Proposition 57 to prohibit the transfer to adult court of minors under age 16 at the time of the offense. (See § 707, subd. (a)(1)-(2), as amended by Stats. 2018, ch. 1012, § 1.)

---

[5] The complaint is not part of the record on appeal.

[6] The petition is not part of the record on appeal.

On April 16, 2021, in case No. J22783C, the prosecution filed an amended 602 petition alleging that minor committed murder (Pen. Code, § 187, subd. (a)) on August 8, 2012.  On April 21, 2021, minor admitted the murder allegation, which the parties stipulated was second degree.  Minor was advised and understood that murder was a 707(b) offense.

### 3.    Disposition Hearing on Current Petition

The prosecution moved the juvenile court to exercise its discretion under section 782 to dismiss the petitions in case Nos. J22783A and J22783B in the interests of justice and for minor's benefit.  The prosecution argued that the dismissals were necessary "to circumvent [section] 733" to allow the court to commit minor to DJJ and that a DJJ commitment was necessary for the community's safety and minor's rehabilitation.

Minor filed written opposition.  Minor argued that the juvenile court was precluded from dismissing the prior petitions because the dismissals would occur post-disposition and because the court lost jurisdiction in those cases when the wardships terminated in 2018.[7]

At the May 4, 2021 disposition hearing, the juvenile court dismissed the previously adjudicated petitions in case Nos. J22738A and J22783B, declared minor a ward of the court, and committed him to DJJ.

Citing *Greg F.*, the court observed that in deciding whether to exercise its discretion under section 782 to dismiss a 602 petition in the interests of justice and in the minor's welfare, it must consider all the circumstances relevant to the public's need for safety and the juvenile's need for rehabilitation.  The court stated that its focus was "[g]iving [minor] the tools and therapies to give him the best possible chance of being a

---

[7] At the disposition hearing minor added that he "object[ed] on constitutional grounds, due process grounds."  Minor did not specify the basis of his due process objection.

5

safe and productive member of our society" and found that "[i]f the Court were to make any order other than DJJ, [minor] would not be served." The court also found that a DJJ commitment was necessary to hold minor responsible for Joey M.'s death, which was important to Joey M.'s family, minor's coparticipants in the offense, and the community. The court noted that it would lose jurisdiction over minor unless it committed him to DJJ because minor was already over age 21.

The court found that "[o]nly if [it] orders DJJ . . . is [minor] eligible to receive the help and assistance he still needs up to age 25 and transitional services by our local probation department three months before his release date." The court explained that DJJ offers job training and certification programs as well as college classes, and that 90 days before a minor's release, probation helps the minor transition back to society, connecting the minor with counseling, therapy, and career counseling. The court observed that minor had witnessed violence, experienced isolation, periodically lacked a father figure, and had "kill[ed] a stranger [his] own age by shooting them in the back twice and liv[ed] out critical formative teenage years behind bars as a teen and now as a young adult. . . . [¶] All of those events led him and has kept him involved in the gang lifestyle as a northerner believing he is safer with them than without them. He is in need of cognitive behavioral interventions and modalities intensively available to him only in DJJ." The court noted minor's diagnosis of PTSD and his use of controlled substances, gang identity, and violence as coping tools.

The court found, "Releasing [minor] now without support only because he is over 21 and has aged out of other dispositional options, [would] make[] all that he, his family, and the victim's family have gone through these years without value." The court observed that when minor was placed out of county during an earlier wardship, it "really helped [him]. And so I do believe that getting out of this lifestyle, out of the same connections to be able to go away and work on you will be really helpful and give you a break from the tension and the responsibilities that you feel to your gang lifestyle." The

6

court found minor amenable to treatment and that minor had "a higher need than most for intensive trauma focused cognitive behavior individual counseling."

The court noted that minor had been in the county jail for the last three years where no programs were offered to him. The court stated, "I believe the encouragement and foundation for [minor's] success will be through the hard work and [DJJ] programs. . . . [¶] The year and a half available to him for rehabilitation will give him an opportunity to gain understanding of his trauma, find his independence, find his gifts, and get the encouragement by the mental health professional team, educational coaches, and career technical educators. [¶] I see him obtaining college credits, engaging in apprentice and career readiness programs, so when he returns to our county he has a way to choose a productive and safe future for himself, his family, and the community." The court concluded, "[Minor's] mental and physical condition and qualifications render it probable that [he] will benefit from the reformatory discipline and other treatment provided by [DJJ]."

The court entered "the specific reasons" stated above for its dismissal of the adjudicated petitions pursuant to section 782 in the court minutes. (Cal. Rules of Court, rule 5.790(a)(2)(A).)[8]

### III.   DISCUSSION

Minor contends that the juvenile court was without authority to dismiss the previously adjudicated petitions in order to commit him to DJJ because section 733(c) "specifically bars a DJ[J] commitment when the most recent offense alleged in any petition is not a serious felony." The Attorney General counters that the court properly acted within its discretion to dismiss the petitions because "section 733 does not subjugate a juvenile court's power to dismiss under section 782." Both parties extensively discuss *Greg F.*, where the California Supreme Court held that a juvenile

---

[8] All further rule references are to the California Rules of Court.

court could "use its broad discretion under section 782 to dismiss [a] second petition so that the matter can be treated as a probation violation, allowing the ward to be committed to DJ[J]." (*Greg F.*, *supra*, 55 Cal.4th at p. 400.)

Although unlike *Greg F.* this case involves the dismissal of adjudicated petitions, for the reasons stated there and based on our de novo review of sections 733(c) and 782 and the circumstances before us, we determine that the juvenile court had the discretion under section 782 to dismiss the prior petitions in the interests of justice and in minor's welfare so that it could commit minor to DJJ.

## A. *Sections 733(c) and 782*

Enacted in 2007 as part of the realignment legislation, section 733 prohibits DJJ commitments in certain circumstances. (Sen. Bill No. 81 (2007-2008 Reg. Sess.) ch. 175, § 22.) "One aspect of Senate Bill No. 81 (2007-2008 Reg. Sess.) was to 'stop the intake [to DJJ] of youthful offenders adjudicated for non-violent, non-serious offenses (non-707b offenses).' " (*Greg F.*, *supra*, 55 Cal.4th at p. 409.) The legislation was based on budgetary concerns as well as "findings that better results could be obtained at the local level for nonviolent juvenile offenders. An argument in support of Senate Bill No. 81 stated: 'Quite simply most counties do it better and for less cost. The offenders that will be diverted are non-serious, non-violent, non[-]sex offender[ ] wards who likely can be better served in their communities closer to their existing support systems.' [Citation.]" (*Id.* at pp. 409-410.)

Subdivision (c) of section 733 bars a DJJ commitment if "[t]he ward has been or is adjudged a ward of the court pursuant to Section 602, and the most recent offense alleged in any petition and admitted or found to be true by the court is not described in subdivision (b) of Section 707 or subdivision (c) of Section 290.008 of the Penal Code."

Section 782 was enacted in 1971. (Stats. 1971, ch. 607, § 1.) " '[T]he authority to dismiss juvenile matters at the disposition stage' " was "statutorily expressed between 1915 and 1961," but was repealed in 1961 "[w]hen the entire juvenile court law was

8

repealed and recodified." (*Greg F.*, *supra*, 55 Cal.4th at p. 405.)  Section 782 was drafted after a 1971 Court of Appeal decision, which recognized the inherent power of juvenile courts to exercise discretion to dismiss juvenile matters, to " ' "restor[e] to the juvenile law the clear power of the court to dismiss juvenile petitions in the interests of justice." [Citation.]' [Citation.]" (*Greg F.*, *supra*, at p. 406.)

Section 782 currently provides, "A judge of the juvenile court in which a petition was filed may dismiss the petition, or may set aside the findings and dismiss the petition, if the court finds that the interests of justice and the welfare of the person who is the subject of the petition require that dismissal, or if it finds that he or she is not in need of treatment or rehabilitation.  The court has jurisdiction to order dismissal or setting aside of the findings and dismissal regardless of whether the person who is the subject of the petition is, at the time of the order, a ward or dependent child of the court.  Nothing in this section shall be interpreted to require the court to maintain jurisdiction over a person who is the subject of a petition between the time the court's jurisdiction over that person terminates and the point at which his or her petition is dismissed."

### B.      *Greg F.*

The minor in *Greg F.* was on probation for a 707(b) offense when he committed battery, a non-707(b) offense.  (*Greg F.*, *supra*, 55 Cal.4th at pp. 401, 405.)  Rather than alleging a probation violation in a section 777 notice, which would have allowed for a DJJ commitment, "the prosecutor mistakenly brought the minor's new offense before the court in a 602 petition." (*Greg F.*, *supra*, at p. 405.)  The question before the California Supreme Court was "whether the [juvenile] court had discretion to dismiss the 602 petition, after the minor had admitted the non-DJ[J]-eligible offense there alleged [but before disposition], and treat the matter as a probation violation." (*Ibid.*)

A divided court held that the juvenile court had the discretion under section 782 to dismiss the second petition so that it could commit the minor to DJJ on the probation violation.  (*Greg F.*, *supra*, 55 Cal.4th at p. 400; but see *id.* at pp. 420-427 (dis. opn. of

Cantil-Sakauye, C.J.).) "When a DJ[J] commitment for a section 707(b) offense for which probation was ordered serves the interests of justice and the welfare of the minor, the juvenile court has discretion to dismiss a new 602 petition to permit treatment of the matter as a probation violation." (*Id.* at p. 412.)

The court observed that "[f]or over 40 years, section 782 has given juvenile courts the power to dismiss a delinquency petition if doing so serves the interests of justice and the welfare of the minor" (*Greg F.*, *supra*, 55 Cal.4th at p. 407) and that "[n]othing in the language of section 733 indicates that the Legislature intended this provision to override the juvenile court's discretion to dismiss" (*id.* at p. 406). "Section 733(c) does not mention section 782, nor does it state that its provisions prevail over section 782, or any other law. When the Legislature intends for a statute to prevail over all contrary law, it typically signals this intent by using phrases like 'notwithstanding any other law' or 'notwithstanding other provisions of law.' [Citations.] The Legislature did not include this language in section 733(c), nor did it amend section 782 to prohibit dismissals to permit a DJ[J] commitment." (*Id*. at pp. 406-407.) The court found "[t]he absence of such an express limitation on the juvenile court's power under section 782 . . . significant." (*Id*. at p. 407.) " ' "The failure of the Legislature to change the law in a particular respect when the subject is generally before it and changes in other respects are made is indicative of an intent to leave the law as it stands in the aspects not amended." [Citations.]' " (*Ibid.*)

Although the court found it unnecessary "to resort to legislative history," the court found nothing in section 733(c)'s legislative history "to suggest that the Legislature intended to deprive juvenile courts of their long-standing discretion to dismiss delinquency petitions when appropriate." (*Greg F.*, *supra*, 55 Cal.4th at pp. 408-409, fn. omitted.) "Section 733(c)'s limitation on juvenile offenders eligible for a DJ[J] commitment was 'motivated by a desire to reduce the cost and increase the effectiveness of juvenile confinement.' [Citation.] The legislative history consistently stresses that

only wards who are *not currently violent* will be diverted from state to local responsibility." (*Id.* at p. 410.) "[I]t is clear that the Legislature intended to preserve the possibility of DJ[J] commitments for violent offenders and sex offenders. In keeping with this clear legislative intent, it is not reasonable to interpret [section 733(c)] as restricting the juvenile court's ability to order an appropriate disposition for such offenders. Nothing in the legislative history surrounding the enactment of section 733(c) suggests the Legislature intended to strip juvenile courts of their long-held discretion to dismiss a delinquency petition when dismissal is in the interests of justice and for the minor's welfare. 'We are not persuaded the Legislature would have silently, or at best obscurely, decided so important . . . a public policy matter and created a significant departure from the existing law.' [Citation.]" (*Ibid.*)

The court limited its holding to the dismissal of a second petition to allow a DJJ commitment on a probation violation on the minor's previously sustained 602 petition (*Greg F.*, *supra*, 55 Cal.4th at pp. 400, 420), and stated "no opinion" on whether a section 782 dismissal of "a 602 petition *after* disposition" "could ever be appropriate" as it "potentially raises a host of constitutional concerns" (*Greg F.*, *supra*, at p. 415).

### C. *Standard of Review*

A section 782 dismissal is reviewed for abuse of discretion. (*Greg F.*, *supra*, 55 Cal.4th at p. 413.) However, the question of "whether the commitment limitation of section 733(c) prevails over the dismissal discretion granted by section 782" requires statutory interpretation, which we perform de novo. (*Id.* at p. 406; see *People v. Prunty* (2015) 62 Cal.4th 59, 71.) "We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.] To determine legislative intent, we turn first, to the words of the statute, giving them their usual and ordinary meaning. [Citations.] When the language of a statute is clear, we need go no further. However, when the language is susceptible of more than one reasonable interpretation, we look to a variety of extrinsic aids, including the ostensible

11

objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part. [Citations.]" (*People v. Flores* (2003) 30 Cal.4th 1059, 1063.)

### D. *Section 733(c) Did Not Bar the Dismissal of the Adjudicated Petitions Under These Circumstances*

As we stated above, the California Supreme Court in *Greg F.* upheld the juvenile court's section 782 dismissal of a second sustained 602 petition alleging a more recent non-707(b) offense so that the court could commit the minor to DJJ on a probation violation. (*Greg F.*, *supra*, 55 Cal.4th at p. 400; see also *In re J.L.* (2008) 168 Cal.App.4th 43 [same].) We understand that the holding in *Greg F.* was narrow and based on the unique circumstances before the court. (See *Greg F.*, *supra*, 55 Cal.4th at pp. 400, 414.) Although the procedural posture differs here, as this case involves the dismissal of adjudicated petitions in order to commit minor to DJJ on the most recently sustained petition, based on the California Supreme Court's reasoning in *Greg F.*, our de novo review of sections 733(c) and 782, and the circumstances before us, we conclude that the juvenile court had the discretion under section 782 to dismiss the prior petitions in the interests of justice and in minor's welfare.[9]

---

[9] The *Greg F.* court examined the juvenile court's use of an earlier petition involving a 707(b) offense to commit the minor to DJJ despite the filing of a subsequent petition involving a more recent non-707(b) offense. (See, e.g., *Greg F.*, *supra*, 55 Cal.4th at pp. 410-411, 414.) When discussing "the unique context" before it, the court stated that "[d]ismissal of a 602 petition enables the court to order a DJ[J] commitment otherwise prohibited by section 733(c) *only for a minor currently* on probation for a DJ[J]-eligible offense. If the minor is not on probation, or is on probation for a nonqualifying offense, a section 782 dismissal can have no effect on DJF eligibility. Section 733(c)'s restrictions on DJ[J] eligibility thus have 'meaningful[ ] operat[ion]' in all delinquency cases involving a minor not on probation, or on probation for a nonqualifying offense." (*Greg F.*, *supra*, at p. 413.) The *Greg F.* court did not analyze the circumstances before us, involving a DJJ commitment on the most recently sustained petition, which alleged a 707(b) offense, and the dismissal of previously adjudicated (continued)

12

As the court observed in *Greg F.*, "[n]othing in the language of section 733 indicates that the Legislature intended this provision to override the juvenile court's discretion [under section 782] to dismiss a petition when dismissal is in the interests of justice and for the welfare of the minor." (*Greg F.*, *supra*, 55 Cal.4th at p. 406.) Nor is there any indication in section 733's legislative history that the Legislature intended the provision to foreclose the juvenile courts' "long-standing discretion [under section 782] to dismiss delinquency petitions when appropriate." (*Greg F.*, *supra*, at p. 409, fn. omitted.) In enacting section 733(c), "it is clear that the Legislature intended to preserve the possibility of DJ[J] commitments for violent offenders and sex offenders. In keeping with this clear legislative intent, it is not reasonable to interpret [section 733(c)] as restricting the juvenile court's ability to order an appropriate disposition for such offenders." (*Greg F.*, *supra*, at p. 410.)

Indeed, section 782 affords the juvenile court broad "jurisdiction to order dismissal . . . regardless of whether the person who is the subject of the petition is, at the time of the order, a ward or dependent child of the court. Nothing in this section shall be interpreted to require the court to maintain jurisdiction over a person who is the subject of a petition between the time the court's jurisdiction over that person terminates and the point at which his or her petition is dismissed." (See also *Greg F.*, *supra*, 55 Cal.4th at p. 419 ["section 782 extended the juvenile court's power to dismiss petitions and set aside findings to minors who were not presently wards of the court" (italics omitted)].)

"If the juvenile court exercises its discretion under section 782 to dismiss a 602 petition, its decision does not nullify or abrogate section 733(c). It simply changes the 'most recent offense alleged in any petition' to which section 733(c) applies *in that particular case*." (*Greg F.*, *supra*, 55 Cal.4th at p. 408.) And the procedural safeguards

---

petitions involving more recent, non-707(b) offenses. (See *Greg F.*, *supra*, at p. 415 ["express[ing] no opinion on whether . . . dismissal [post-disposition] could ever be appropriate"].)

in place—appellate review of a section 782 dismissal for abuse of discretion and rule 5.790(a)(2)(A)'s requirement that the juvenile court provide a written statement of reasons for a section 782 dismissal—guard against arbitrary dismissals and dismissals that do not serve the interests of justice and the minor's welfare. (See *Greg F.*, *supra*, at pp. 413-414; *In re Juan C.* (1993) 20 Cal.App.4th 748, 753 ["The underlying purpose of [a statement of reasons] requirement is to protect the public interest against improper or corrupt dismissals, and to impose a purposeful restraint upon the exercise of judicial power"].)

The Legislature has not amended section 782 to overturn the decision in *Greg F.* despite having 10 years to do so. (See *People v. Williams* (2001) 26 Cal.4th 779, 788-789 [discussing legislative inaction after the California Supreme Court interpreted Penal Code section 240 as requiring only general criminal intent].) In fact, rather than narrowing section 782 after the court decided *Greg F.*, the Legislature expanded the statute's reach by eliminating the requirement that the dismissal occur before the minor reaches age 21 and by adding that the court is not required to maintain jurisdiction over a person who is the subject of a petition between the time the court's jurisdiction over that person terminates and the point at which his or her petition is dismissed. (Sen. Bill No. 1038 (2013-2014 Reg. Sess.) ch. 249, § 1.) " ' "The failure of the Legislature to change the law in a particular respect when the subject is generally before it and changes in other respects are made is indicative of an intent to leave the law as it stands in the aspects not amended." [Citations.]' [Citations.]" (*Greg F.*, *supra*, 55 Cal.4th at p. 407; see also *People v. Frahs* (2020) 9 Cal.5th 618, 634 ["we are mindful that the Legislature 'is deemed to be aware of existing laws and judicial constructions in effect at the time legislation is enacted' "].) And the Legislature has made no amendments to section 733 after *Greg F.*

While the *Greg F.* court questioned whether a section 782 dismissal of "a 602 petition *after* disposition" "could ever be appropriate" as it "potentially raises a host

of constitutional concerns" (*Greg F.*, *supra*, 55 Cal.4th at p. 415), minor alleges no constitutional claim here.  Moreover, the California Supreme Court made those statements while discussing *V.C. v. Superior Court* (2009) 173 Cal.App.4th 1455, 1467 (*V.C.*), where the dismissal of a sustained petition " 'rescind[ed] a plea bargain that ha[d] been accepted and fully executed.' " (*Greg F.*, *supra*, 55 Cal.4th at p. 415.)  Here, there is no claim that the dismissal of the adjudicated petitions violated minor's "constitutional right to the benefit of his completed plea bargain." (*Ibid*.)  And despite voicing concern over the dismissal of a 602 petition post-disposition, the California Supreme Court expressly "disagree[d] with the *V.C.* court's holding that section 733(c) must always override the juvenile court's ability to dismiss a delinquency petition under section 782." (*Greg F.*, *supra*, at p. 415.)

Based on the different procedural posture here, minor contends that *Greg F.* does not support the juvenile court's dismissal of the adjudicated petitions and that *In re A.O.* (2017) 18 Cal.App.5th 390 (*A.O.*) demonstrates that the juvenile court lacked the authority to dismiss.  We find *A.O.* distinguishable.

In *A.O.*, the Court of Appeal reversed the juvenile court's order dismissing a non-707(b) offense in a multicount petition and recommitting the minor to DJJ.  (*A.O.*, *supra*, 18 Cal.App.5th at p. 392.)  The dismissal was ordered for the sole purpose of rendering the minor DJJ-eligible and occurred after DJJ had rejected the court's initial commitment order because the minor's most recent offense was a non-707(b) offense.  (*A.O.*, *supra*, at pp. 392-393.)  The Court of Appeal held that the commitment was barred by section 733(c).  (*A.O.*, *supra*, at p. 393.)

Importantly, in dismissing the non-707(b) offense, the juvenile court in *A.O.* "never purported to invoke section 782." (*A.O.*, *supra*, 18 Cal.App.5th at p. 394.)  The Court of Appeal found that "[e]ven assuming" juvenile courts had "postdispositional authority to dismiss individual counts of a section 602 petition for the sole purpose of securing a DJ[J] commitment" (*id.* at p. 396), based on "the sparse record," it would be

"impossible to determine whether the court's decision to dismiss the . . . charge . . . for the sole purpose of securing a DJ[J] commitment was a proper exercise of discretion" (*id.* at p. 397).

Thus, *A.O.* does not stand for the proposition that a juvenile court's discretion to dismiss under section 782 is proscribed by section 733(c). And, unlike the juvenile court in *A.O.*, the juvenile court here expressly stated that it was dismissing the prior petitions "under WI Section 782," and made detailed findings regarding why the dismissals were in the interests of justice and in minor's welfare.

In his reply brief, minor relies on *In re D.B.* (2014) 58 Cal.4th 941 (*D.B.*) to urge this court to "enforc[e] the plain meaning of section 733(c)." In *D.B.*, the California Supreme Court held that the plain language of section 733(c) bars a DJJ commitment when a 602 petition "alleges a minor has committed a series of criminal offenses, including serious or violent offenses, . . . [and] the last offense in the series is nonviolent." (*D.B.*, *supra*, at p. 944.) The court determined that "[t]he plain language of section 733(c) mandates that a minor may not be committed to DJ[J] unless the most recently committed offense that is alleged in any wardship petition, then admitted or found true, is listed in section 707(b) or Penal Code section 290.008(c)." (*Ibid.*)

Unlike here, the juvenile court in *D.B.* did not exercise its discretion under section 782. (*D.B.*, *supra*, 58 Cal.4th at p. 945.) Nor did the juvenile court in *D.B.* dismiss a petition or any count therein. The multicount petition included allegations that the minor committed seven offenses on May 23, 2010, one of which was a 707(b) offense, and two offenses on May 30, 2010, neither of which was a 707(b) offense. (*D.B.*, *supra*, at p. 945.) "The juvenile court found the allegations true and sustained the petition. It committed D.B. to DJ[J] for the maximum term of 11 years eight months." (*Ibid.*) In determining that the commitment was unlawful under section 733(c), the California Supreme Court never considered, let alone mentioned section 782. Thus, *D.B.*

16

is inapposite here. (See *People v. Baker* (2021) 10 Cal.5th 1044, 1109 [" ' " 'cases are not authority for propositions not considered' " ' "].)

Minor contends "[t]here is no basis in this case for making an exception to the prohibition found in section 733[(c)]" as "[h]e is not among the 'most dangerous offenders' who should be committed to 'costly state-level facilities.' " Minor describes the progress he made during his placement at Tahoe Turning Point and while in juvenile hall, his jail programming, and several experts' opinions on his increased maturity, all of which were before the juvenile court. Minor argues that he has thus "demonstrated the legislative intent behind section 733, to reduce the DJ[J] population and limit it to only the most serious offenders, applied to his circumstances."

We commend minor's progress and his amenability to treatment. However, minor's assertion that based on his progress "[h]e is not among the 'most dangerous offenders' " does not bear on the statutory issue at hand—whether section 733(c) forecloses a juvenile court from dismissing an adjudicated petition pursuant to section 782 in order to commit a minor to DJJ. (See *Greg F.*, *supra*, 55 Cal.4th at p. 420.)

As minor states, "the sole issue on appeal is a question of law: did the juvenile court have the power to dismiss eight-year-old petitions that rendered [him] ineligible for a DJ[J] commitment pursuant to section 733(c)."[10] And as the California Supreme Court observed in *Greg F.*, "the realignment policies served by section 733 are not so unyielding they cannot tolerate occasional exceptions when the severity of a minor's

---

[10] Minor states in his reply brief that "[h]e never argued [in his opening brief that] the court abused its discretion in committing him to the DJ[J] because he was not the type of offender who belonged there. His argument, rather, was that the legislative intent behind section 733 supported his position this was not an exceptional case where the juvenile court should be permitted to dismiss eight-year-old petitions so that he could be committed to the DJ[J]."

17

offenses, and the minor's own special needs, call for a disposition that includes DJ[J]." (*Greg F.*, *supra*, 55 Cal.4th at p. 417.)

"Flexibility is the hallmark of juvenile court law." (*Greg F.*, *supra*, 55 Cal.4th at p. 411.) "The statutory scheme governing juvenile delinquency is designed to give the court 'maximum flexibility to craft suitable orders *aimed at rehabilitating the particular ward before it.*' " (*Ibid.*, italics added; see *In re Aline D.* (1975) 14 Cal.3d 557, 566-567 [stating that if an assessment found that the minor "would not benefit from the treatment she would receive at [DJJ], and if no appropriate alternative placement exists at that time, then the proceedings should be dismissed" pursuant to section 782 because "[j]uvenile commitment proceedings are designed for the purpose of rehabilitation and treatment, not punishment"].) We find that flexibility includes the authority to dismiss adjudicated petitions pursuant to section 782 under certain circumstances that are in the interests of justice and in the minor's welfare.

Based on our de novo review of sections 733(c) and 782, the California Supreme Court's guidance and reasoning in *Greg F.*, and the circumstances before us, where the filing of the current murder petition was delayed due to law enforcement investigation and minor admitted the more recent non-707(b) offenses alleged in the adjudicated petitions while the homicide investigation was ongoing, where the juvenile court's only options were to lose jurisdiction over minor or commit him to DJJ to receive rehabilitative services and the court made the requisite findings under section 782 that the dismissal was in the interests of justice and in minor's welfare and provided a statement of reasons for the dismissal pursuant to rule 5.790(a)(2)(A), and where there is no contention that the dismissal of the adjudicated petitions violated minor's constitutional rights or rescinded the terms of a plea agreement, we conclude that section 733(c) did not bar the juvenile court from exercising its discretion under section 782 and dismissing the adjudicated petitions in the interests of justice and in minor's welfare in order to commit minor to DJJ.

## IV.    DISPOSITION

The judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, J.

I CONCUR:

_____
ELIA, ACTING P.J.

***In re J.B.***
**H049130**

19

Lie, J., Dissenting:

Urged by the prosecution to "take a risk" and "remedy the absurdity" of Welfare and Institutions Code section 733, subdivision (c)[11] (section 733(c)), the juvenile court committed J.B. to the California Department of Corrections and Rehabilitation's Division of Juvenile Facilities (DJF). It did so under the auspices of section 782, by dismissing over J.B.'s jurisdictional and constitutional objections two wardship petitions adjudicated nine years earlier. The dismissed petitions barred DJF commitment under section 733(c)'s plain terms and accordingly would have required J.B.'s release, his having aged in custody from 14 to 23 while the prosecution sought to charge him as an adult for the gang-related murder of a minor even younger than he. As with any statutory interpretation, reconciliation of sections 733(c) and 782 requires us to "presume[] every part of a statute has some meaning and effect," and "to avoid, if possible, a construction that renders statutory language surplusage." (*In re Greg F.* (2012) 55 Cal.4th 393, 424 (*Greg F.*), dis. opn. of Cantil-Sakauye, C.J.) Because I believe the majority's statutory interpretation exceeds the letter and spirit of the narrow rule announced by our Supreme Court in *Greg F.*, I respectfully dissent.

## I.      *Background of Section 733*

In November 2004, the State of California stipulated to the entry of a consent decree in *Farrell v. Harper* (Super. Ct. Alameda County, 2003, No. RG03079344), to reform "a [juvenile corrections] system plagued by unprecedented violence . . . that prevented education and counseling programs." (Little Hoover Com., Juvenile Justice Reform: Realigning Responsibilities (July 2008) p. i <https://lhc.ca.gov/sites/lhc.ca.gov/files/Reports/192/Report192.pdf> [as of Feb. 18, 2022], archived at <perma.cc/PK9L-S8HL>.) "[N]early four years and hundreds of millions of dollars later" and facing the prospect of receivership nonetheless, "policy-makers acted to

---

[11] Unspecified statutory references are to the Welfare & Institutions Code.

reduce the number of youth offenders housed in state facilities by . . . shift[ing] responsibility to the counties for all but the most serious youth offenders." (*Id*. at pp. i-ii; see also Legislative Analyst's Office, Analysis of the 2007-08 Budget Bill: Judicial and Criminal Justice <https://lao.ca.gov/analysis_2007/crim_justice/cj_06_anl07.aspx> [as of Feb. 18, 2022], archived at <perma.cc/TBL3-4QQQ> [projecting net savings of "$97 million annually, from . . . proposed legislation and budgetary changes to shift certain juvenile offenders" from state facilities to counties].) The Legislature accordingly prohibited juvenile courts from committing a minor to DJF[12] when the minor's "most recent offense alleged in any petition and admitted or found to be true by the court" is not an offense enumerated in section 707, subdivision (b) or Penal Code section 290.008, subdivision (c). (§ 733, subd. (c).)

Seven years later, the Supreme Court concluded, "[a]lthough reasonable minds may debate the wisdom of the chosen approach, decisions about how to limit DJF commitments are the Legislature's to make. [¶] . . . [¶] The language of section 733(c) is clear. It prohibits a DJF commitment unless the most recent offense alleged in any petition and admitted or found true is listed in section 707(b) or Penal Code section 290.008, [subdivision] (c). [Citation.] We are not free to rewrite the law simply because a literal interpretation may produce results of arguable utility." (*In re D.B.* (2014) 58 Cal.4th 941, 948 (*D.B.*).)

## B.     *Application of* Greg F.

---

[12] On May 14, 2021, the Governor signed into law Senate Bill 92, which announced the closure of the Division of Juvenile Justice, encompassing DJF, and established as its successor the Office of Youth and Community Restoration, within the state's Health and Human Services Agency. (Stats. 2021, ch. 18, § 12.) This development in juvenile justice realignment added section 875 et seq., which governs commitment to local "secure youth treatment facilities" in lieu of DJF. (Compare § 875, subd. (c)(1) with § 1769, subd. (d)(2).)

2

The persistence of argument over the utility of section 733(c) nonetheless led the juvenile court here to accept the prosecution's invitation to "remedy the absurdity" of section 733(c), by dismissing the two petitions which under the statute would prevent J.B.'s commitment to DJF.  The "risk" acknowledged by the prosecution lay in jettisoning the narrowly crafted rule of *Greg F.*, where a divided court held—in "the unique context" of "a minor *currently* on probation for a DJF-eligible offense"—that a petition alleging wardship for a DJF-ineligible offense may be dismissed at or before disposition despite the minor's prior admission of the offense.  (*Greg F.*, *supra*, 55 Cal.4th at p. 413.)  In answer to the dissenters' concern that its harmonization of section 733(c) and 782 permitted " 'a juvenile court [to] always avoid the DJF-ineligibility provisions of section 733(c),' " the *Greg F.* majority emphasized that "[i]f the minor is not on probation, or is on probation for a nonqualifying offense, *a section 782 dismissal can have no effect on DJF eligibility*. Section 733(c)'s restrictions on DJF eligibility thus have 'meaningful[] operat[ion]' in all delinquency cases involving a minor not on probation, or on probation for a nonqualifying offense.  [Citation.]" (*Id.* at p. 413, italics added.)  Because J.B. was not on probation for a DJF-eligible offense either when he shot 13-year-old Joseph Mendoza or when he admitted the more recent DJF-eligible offenses, the rule announced in *Greg F.* does not support the juvenile court's dismissal here.

Even assuming the interstitial opening *Greg F.* identified between sections 733(c) and 782 may legitimately be expanded to other contexts, I do not believe that the policy considerations by which the court reached its conclusion in *Greg F.* would support the dismissal orders here.

1.  **Status of the DJF-Ineligible Petition at Dismissal**

Although the court in *Greg F.* "express[ed] no opinion on whether [a post-disposition] dismissal could ever be appropriate," it cautioned that "[d]ismissing a 602 petition *after* disposition potentially raises a host of constitutional concerns not presented in the case before us." (*Greg F.*, *supra*, 55 Cal.4th at p. 415.)  In *Greg F.*, the admission of a

3

DJF-ineligible offense had resulted in no material deprivation of the minor's liberty in the few days between admission and the dismissal of the petition: the minor was already detained in juvenile hall awaiting placement when he committed the DJF-ineligible offense and during pendency of the ensuing petition. (*Id.* at p. 401.)

But J.B., adjudged a ward of the court in 2012 only for DJF-ineligible offenses, was ordered to out-of-home placements, first in a local treatment facility, then in an out-of-county facility, for a period of approximately 10 months. Notwithstanding the record of their undisputed rehabilitative effect, the conditions of J.B.'s wardship and his submission to those conditions represented a restriction on his freedom.[13] Because J.B. was not then on probation for a DJF-eligible offense, these placements could not be discounted as a lenient alternative to the potentially more severe sanction available for a revocation of probation as to a more serious offense.

The majority suggests that J.B.'s failure to allege a constitutional claim on appeal should allay *Greg F.*'s "host of constitutional concerns" (*Greg F.*, *supra*, 55 Cal.4th at p. 415) implicated by postdisposition dismissal for the purpose of evading section 733(c). But our interpretation of statutes is typically informed by canons of interpretation, including the doctrine of constitutional avoidance, whether or not the claim of statutory error is coupled with a separate constitutional claim on appeal. To condition statutory interpretation on an appellant's cognizable constitutional claim "would render every statute a chameleon, its meaning subject to change depending on the presence or absence of constitutional concerns in each individual case." (*Clark v. Suarez Martinez* (2005) 543 U.S. 371, 382.) J.B. is therefore not required to have preserved a standalone constitutional claim for us to be

---

[13] The restriction apparently included his freedom from compelled self-incrimination. During J.B.'s first out-of-home placement, he confided to a counselor that he was struggling with feelings of guilt for having shot and killed another boy he believed to be a Sureño. The treatment program then terminated J.B.'s participation and reported his confession as a basis for the termination. J.B.'s objection in the juvenile court to its consideration of this confession is not before us on appeal.

mindful that permitting the post hoc dismissal of an adjudicated, DJF-ineligible wardship petition would restore only the prosecution and the juvenile court to their pre-adjudication interests, not the ward who has thereby been denied the operation of section 733(c).

The Legislature has amended section 782 to permit dismissals after the minor turns 21 and wardship is thereby terminated. (§ 782, as amended by Stats. 2014, ch. 249 § 1, eff. Jan. 1, 2015.) But the legislative history of this amendment reflects a specific purpose wholly consonant with section 733(c)—to achieve the "even greater reductions" in prison population that the federal court overseeing "ongoing prison overcrowding litigation" was expected to order, by "better ensuring that juveniles have a clear pathway to clearing their records[]"when "many youth[s] are unaware of their right" to dismissal. (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 1038 (2013-2014 Reg. Sess.) as amended Mar. 28, 2014, pp. 6-7.) This feature of section 782 can therefore be harmonized with section 733(c)—consistently with *Greg F.*'s narrow holding—to condition post-disposition, post-termination dismissals of adjudicated petitions either on the ward's consent or on reduction of the prison population. Dismissal of J.B.'s adjudicated petitions of course had the opposite effect, by design.

### 2. Conduct of the Wardship Proceedings

In resolving the tension between sections 782 and 733(c) to permit dismissal after jurisdictional findings but before disposition, the majority in *Greg F.* considered the practical aspects of the juvenile court proceedings to justify granting the juvenile court and prosecution what it considered a modest margin of error. The relevant circumstances consisted of the inadvertence of the prosecution's error in filing "a 602 petition rather than a 777 notice" alleging a probation violation, "the unusually short deadlines in juvenile delinquency matters," as well as the risk that foreclosing dismissal of a petition already admitted would "reward gamesmanship" by a minor who might tactically rush to admit later DJF-ineligible offenses "at the detention hearing, just one day after the petition was filed[]"

5

to capitalize on the prosecution's inadvertent filing error. (*Greg F.*, *supra*, 55 Cal.4th at pp. 411-413.)

Nothing in the litigation of the instant wardship petitions suggests a need for accommodation analogous to those animating *Greg F.*'s narrow holding. The record reflects neither haste nor inadvertence, but rather deliberate and consistent tactical choices over several years as the prosecution, as was its prerogative, exhausted every means of securing the maximum period of J.B.'s confinement. Having initially charged J.B. as an adult, the prosecution responded to the passage of Proposition 57 by seeking his transfer back to the criminal court. When J.B. sought dismissal of the DJF-ineligible petitions during the transfer litigation, the prosecution opposed the request as " 'not justice.' " Upon the passage of Senate Bill 1391 (Stats. 2018, ch. 1012, § 1), the prosecution challenged the constitutionality of the new prohibition on the transfer of juveniles accused of committing crimes at age 14 or 15 unless first apprehended after the end of juvenile court jurisdiction. (§ 707, subd. (a)(1)–(2), as amended by Stats. 2018, ch. 1012, § 1; *O.G. v. Superior Court* (2021) 11 Cal.5th 82, 89 (*O.G.*).) As a consequence of the stay of proceedings the prosecution obtained pending the Supreme Court's decision in *O.G.*, J.B. continued in adult jail for years, without the treatment by which he had previously achieved much of the progress now lauded by the majority, the prosecution, and the juvenile court.

Accordingly, nothing in the practical exigencies of prosecuting the wardship petitions themselves would appear to necessitate any expansion of *Greg F.*

### 3. Absurdity Doctrine

Irrespective of the conduct of the wardship proceedings themselves, however, the record does support an inference that law enforcement would not have identified J.B. as a suspect in Mendoza's death as early as November 6, 2012, or January 4, 2013, the dates that J.B admitted the first and second of the offenses that would make him ineligible for commitment to DJF by operation of section 733(c). It is not surprising that allegations of lesser, readily detectible, DJF-ineligible offenses proceed more promptly to petition and

disposition than homicides, thereby implicating section 733(c).  But there is also no basis to conclude that the unavailability of a DJF commitment on a procedural history such as this would be at odds with the Legislature's purpose in initially enacting section 733(c) in 2007. The evolution of juvenile justice realignment in the past two years underscores the legislative commitment to end state facility placements.  (See, e.g., §§ 733.1 [ward shall not be committed to Division of Juvenile Justice on or after July 1, 2021], 736.5 [legislative intent to close Division of Juvenile Justice], 875 [setting maximum term of commitment in local "secure youth treatment"].)[14]  "When statutory language is unambiguous, we must follow its plain meaning ' " 'whatever may be thought of the wisdom, expediency, or policy of the act, even if it appears probable that a different object was in the mind of the legislature.' " ' "  (D.B., supra, 58 Cal.4th at p. 948.)

Although the majority concludes that D.B.'s silence as to section 782 makes it inapposite here, I respectfully disagree:  in construing section 733(c), the court in D.B. applied the absurdity doctrine as an interpretive canon and nonetheless deferred to section 733(c)'s plain language.  (D.B., supra, 58 Cal.4th at p. 947, citing People v. Mendoza (2000) 23 Cal.4th 896, 908 ["We must . . . avoid a construction that would produce absurd consequences, which we presume the Legislature did not intend."].)  I believe we are bound by D.B.'s holding that not even the "certainly troubling" potential consequences the unanimous court foresaw flowing from its reading of section 733(c) entitled the juvenile courts to adopt their own ad hoc remedies.  (D.B., supra, 58 Cal.4th at p. 948.)  This pure conclusion of law is what the juvenile court implicitly rejected below in its express consideration of the interests of J.B.'s coparticipants, Joseph Mendoza's family, and the

---

[14] In contrast, each of the minors in Greg F., In re J.L. (2008) 168 Cal.App.4th 43, and V.C. v. Superior Court (2009) 173 Cal.App.4th 1455, had been the beneficiary of the juvenile court's forbearance from an initial DJF commitment for an eligible offense, but had committed a DJF-ineligible offense in spite of that forbearance.  In such contexts, precluding resort to section 782 would have the arguably absurd result of disincentivizing a juvenile court's early efforts at less restrictive placements, thereby thwarting the very legislative mandate to limit DJF commitments.

public in extending J.B.'s confinement by dismissing his adjudicated DJF-ineligible petitions under section 782 and committing him to a state institution slated for closure.

Had the Legislature been content to continue relying on the ad hoc discretion of the juvenile court when the most recent offense alleged in any petition was DJF-ineligible, section 733(c) and the limitation indicated by its plain terms would have been unnecessary. Because I believe the juvenile court erred in dismissing the DJF-ineligible petitions to commit J.B. to DJF, I would reverse the judgment.

_____
LIE, J.

*People v. J.B.*
**H049130**

8

Trial Court:                                          Santa Cruz County Superior Court
                                                      Superior Court No.:  J22783C


Trial Judge:                                          Hon. Denine J. Guy


Attorneys for Defendant and Appellant:   Paul Couenhoven
J.B.                                                 Sixth District Appellate Program


Attorney for Plaintiff and Respondent:   Rob Bonta
The People                                           Attorney General of California
                                                     Lance E. Winters
                                                     Chief Assistant Attorney General
                                                     Jeffrey M. Laurence
                                                     Senior Assistant Attorney General
                                                     Rene A. Chacon
                                                     Supervising Deputy Attorney General
                                                     Bruce Ortega
                                                     Deputy Attorney General

*In re J.B.*
**H049130**